Opinion issued March 17, 2016



In The

# Court of Appeals

For The

## First District of Texas

_____

NO. 01-15-00830-CV

_____

## IN THE INTEREST OF C.M. AND C.F., CHILDREN

_____

**On Appeal from the 306th District Court**
**Galveston County, Texas**
**Trial Court Case No. 13-CP-0068**

_____

## MEMORANDUM OPINION

The Department of Family and Protective Services of Galveston County sought to terminate the parental rights of a mother and father to their two young daughters, Cindy and Cheryl.[1] Mother participated at the termination trial; Father

---

[1]    The mother will be referred to as "Mother," the father as "Father," and the children as Cindy and Cheryl to protect their identities and for ease of reading.

did not. After three days of testimony, the Department rested, Mother moved for a directed verdict on all grounds, and the trial court granted the directed verdict and declared that Mother's parental rights were not terminated.

The Department argues that it presented sufficient evidence to raise a fact issue on all pleaded grounds for termination and on whether termination is in the children's best interest. It challenges the trial court's order granting Mother a directed verdict, arguing that the court improperly removed fact issues from the jury's consideration.

We reverse.

## Background

Mother is in her early thirties and has had a long history of drug use and involvement with Child Protective Services. She has three older children who were the subject of Department investigations. Mother agreed to place all three of the older children with relatives before either of the two children that are the subject of this suit—Cindy and Cheryl—were born.

In 2013, when Cindy was two years old, CPS began an investigation on allegations that Cindy was left unbathed and there were drugs in the home. There also was an allegation that Mother had "yanked" Cindy by the arm, but CPS ruled out physical violence against the young girl. Both parents were drug tested; both

had positive test results for cocaine. Cindy was removed from the home and placed with Mother's aunt.

A family service plan was created that listed the steps Mother would be required to complete to be eligible for Cindy to be returned to her care. These included random drug testing, completing an outpatient treatment program, attending NA/AA meetings, maintaining employment and stable housing, and participating in supervised visitation, among others. The plan identified the Department's permanency goal as family reunification.

There is a statutory deadline to resolve termination suits within one year. *See* TEX. FAM. CODE ANN. § 263.401(a) (West Supp. 2015). Through various mechanisms discussed later, this case was pending almost two full years. In the interim, Cheryl was born and immediately removed from Mother. By the end, the Department had changed its goal to termination, for both girls, and a jury was empaneled to hear the termination suit in March 2015.

The Department sought termination under Subsections (D) (dangerous conditions); (E) (dangerous conduct); (O) (court-order violation); and (P) (controlled-substance use) and under Section 161.003 (mental or emotional illness). *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O), & (P) (West Supp. 2015); *Id.* § 161.003 (West Supp. 2015). It further argued that termination was in the girls' best interest.

3

The jury received undisputed evidence that Mother completed all but two of the requirements in her service plan. First, she failed two drug tests during the first year she was under the service plan. She also admitted to taking a single Vicodin pill without a prescription during the second year of her plan. But she passed all of the drug tests during the remainder of her case.

Second, she never completed outpatient therapy. There was evidence that Mother began outpatient therapy on four separate occasions, attended a total of six months of outpatient-therapy sessions, and voluntarily enrolled in and successfully completed a 30-day inpatient therapy stay that was not part of her service plan.

Mother did successfully complete individual therapy. She consistently attended NA/AA meetings. She held the same job during the entire two years of the case. And she was able to secure an apartment to satisfy the requirement of stable housing. Further, there was ample evidence that the girls were well bonded to Mother and that her interaction with them was appropriate. She was described as "determined and motivated" to satisfy the Department's requirements and regain custody of her children.

At trial, there was disagreement among the professionals about whether the goal should be reunification or termination. There was evidence that her Department-assigned therapist supported reunification. Mother's first Department caseworker did as well. However, Mother's latest caseworker recommended

4

termination, as did the most recent CASA representative assigned to the children's case. They based their recommendation on Mother's failure to complete the outpatient services and on the failed drug tests and admitted Vicodin use.

Mother's aunt testified that she supported termination, though she based her opinion on the past decade of drug use and a comparison between Mother and the foster mother with whom she had developed a rapport.

After three days of testimony, the Department rested. Mother moved for a directed verdict on all grounds for termination. The trial court granted the motion and entered an order for monitored return of the children to Mother with additional services to be provided.

The Department challenged the court's ruling in a number of ways, both in the trial court and in this Court. The Department filed a direct appeal to challenge the directed verdict but later voluntarily dismissed its appeal. It then filed a petition for writ of mandamus, which was denied. *In re C.M.*, No. 01-15-00578-CV, 2015 WL 4572775, at *1 (Tex. App.—Houston [1st Dist.] July 30, 2015, orig. proceeding). Currently before us is the Department's second-filed direct appeal of the directed verdict.

## Jurisdiction

Mother asserts that the Department's appeal is not timely. The directed verdict was granted in March 2015, and the Department did not file this appeal

5

until more than five months later. Subject-matter jurisdiction is never presumed and, when it appears jurisdiction might be lacking, we are required to resolve the issue. *See Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443–44, 446 (Tex. 1993); *see N.Y. Underwriters, Ins. Co. v. Sanchez*, 799 S.W.2d 677, 679 (Tex. 1990). We asked the parties to brief whether jurisdiction exists. We set forth the jurisdictional facts and our basis for concluding that we do have jurisdiction before turning to the merits of the appeal.

## A.    Jurisdictional facts

The suit against Mother and her common-law husband to terminate their parental rights began in 2013. Trial began in March 2015[2] against Mother. Neither Father nor his attorney appeared at trial.

The Department presented evidence for three days and argued that termination of Mother's parental rights to her two daughters, Cindy and Cheryl, was warranted under Subsections (D) (dangerous conditions); (E) (dangerous conduct); (O) (court-order violation); and (P) (controlled-substance use) and under Section 161.003 (mental or emotional illness). *See* TEX. FAM. CODE ANN.

---

[2]    The Legislature has established a one-year statutory deadline for resolving suits to terminate a parent's rights. *See* TEX. FAM. CODE ANN. § 263.401(a) (West Supp. 2015). The one-year deadline for Mother and Father's case was October 6, 2014. The one-year deadline cannot be extended by mutual agreement. *See* TEX. FAM. CODE ANN. § 263.402(a). Nonetheless, all parties involved purported to extend the deadline, by agreement, to March 30, 2015. A party who fails to make a timely motion to dismiss for failure to adhere to the one-year deadline waives the right to object on that basis. *Id.* § 263.402(b).

§ 161.001(b)(1)(D), (E), (O), & (P); *Id.* § 161.003. Immediately after the Department rested, Mother moved for a directed verdict, arguing that the Department failed to submit evidence to raise a fact issue under any of the five theories for terminating her parental rights.

The trial court ruled that "the State has failed to prove anything that must be proved in this kind of case," including a showing that it is in the children's best interest to terminate the parent-child relationship. The court stated that it was "required by law to direct entry of judgment in favor of [Mother]," announced that "there will be no termination," and released the jury.

Under Section 161.205 of the Family Code, "[i]f the court does not order termination of the parent-child relationship" following a trial on the issue, "the court shall: (1) deny the petition; or (2) render any order in the best interest of the child." TEX. FAM. CODE ANN. § 161.205. The Department requested that the trial court enter an order naming it the children's permanent managing conservator and granting Mother only supervised visitation. Mother requested that she be named managing conservator or, if not, that a plan be crafted under which she would continue to receive services from the Department with a goal of family reunification. Over the Department's objection, the trial court ordered a Section 263.403 "monitored return of the children" to Mother.

Section 263.403 allows a trial court to retain jurisdiction over a termination suit beyond that allowed under Section 263.401. Section 263.401(a) requires dismissal of a termination suit on the first Monday after a full year has passed since the court appointed the Department as temporary managing conservator. TEX. FAM. CODE ANN. § 263.401(a). There are two exceptions to this deadline found within Section 263.401. The Subsection (b) exception allows an extension "[u]nless the court has commenced the trial on the merits . . . ." *Id.* § 263.401(b). The Subsection (b-1) exception allows an extension after trial has commenced if the court has granted a motion for new trial or mistrial or the case has been remanded from an appellate court. *Id.* § 263.401(b-1). Neither exception applies here. Section 263.403 offers a third exception. It states that, "[n]otwithstanding Section 263.401, the court may retain jurisdiction and not dismiss the suit or render a final order as required by that section if the court renders a temporary order that . . . orders the department to return the child to the child's parent . . . and orders the department to monitor the child's placement . . . ." *Id.* § 263.403(a). "If the court renders an order under this section, the court shall . . . schedule a new date, not later than the 180th day after the date the temporary order is rendered, for dismissal of the suit unless a trial on the merits has commenced." *Id.* § 263.403(b).

The monitored-return order named the Department as temporary managing conservator of the children and ordered Mother to attend twice-weekly NA/AA

meetings, weekly individual counseling, bi-weekly family counseling, and monthly drug testing. The two girls were returned to Mother that day. The trial judge announced a new dismissal date—180 days in the future—stating, "I want to make sure she's doing well . . . . If we find there's good reason to terminate . . . we can."

Within a week, the Department filed a motion for new trial. It stated that, "[a]fter a trial on the merits, the Court entered a directed verdict against [the Department] and ordered the immediate return of the subject children to the mother, over [the Department]'s objection," and it requested that the court "rescind[] its order granting the directed verdict and grant a new trial." The record does not contain a written order on the motion.

One week later, on March 27, 2015, the trial court entered a written order granting the directed verdict: "It is ordered that the Motion is granted, and [Mother]'s parental rights are not terminated as to the children the subject of this case."

Three days later, the Department filed a notice of appeal with this Court. But the Department voluntarily dismissed its appeal in May, explaining that "the order being appealed from is not a final order that is subject to appeal."

On June 22, the Department filed a motion with the trial court to have the children removed from Mother and returned to foster care based on allegations that Mother tested positive for prescription drugs without producing a valid

9

prescription for the medication, had become unemployed, and was possibly facing eviction. The motion included a notice of hearing date, but the record does not contain a transcript of any hearing on that motion.

The following week, the Department filed a petition for writ of mandamus with this Court to challenge the directed verdict granted to Mother. The petition was denied on July 30. *See In re Tex. Dep't of Family and Protective Servs.*, No. 01-15-00578-CV, 2015 WL 4572775, at *1 (Tex. App.—Houston [1st Dist.] July 30, 2015, orig. proceeding).

On September 1, the trial court entered a written order denying the Department's June 22 motion to remove the children.

The following week, on September 10, 2015, the trial court entered an order dismissing the suit, in its entirety, stating that the suit is "open to dismissal by operation of law." The Department filed a notice of appeal five days after the September 10 dismissal, stating that it is appealing "the directed verdict order of March 27, 2015, and the subsequent dismissal of this case ordered on September 10, 2015."

## B. This Court has jurisdiction

To summarize the procedural history, in March 2015, the trial court called the termination suit to trial, heard evidence from the Department regarding its bases for terminating Mother's parental rights, granted a directed verdict to Mother

10

after the Department rested, left Father's parental rights undetermined, entered a "return and monitor" order, and extended the dismissal date six months into the future. No party appears to have objected to the trial court failing to dispose of the suit within the original one-year deadline or within the "agreed,"[3] extended deadline of March 30, 2015. When the trial court extended the deadline another six months, the Department objected to the decision to return the children to Mother during the period of extension, but neither it nor Mother objected to the actual extension.

There is no indication that Father objected to any of these events, moved to dismiss the termination suit against him, or had his parental rights litigated before the September 10 order dismissing the suit in its entirety.

Whatever peculiarities may exist with regard to how this case has progressed, we conclude that they do not affect our jurisdiction to resolve the appeal. The termination suit was brought against both Mother and Father. His parental rights were not determined at the trial and remained unresolved until the trial court dismissed the suit in its entirety on September 10.

"[I]f the record reveals the existence of parties or claims not mentioned in the order, the order is not final." *Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 206 (Tex. 2001); *In re J.D.*, 304 S.W.3d 522, 524 (Tex. App.—Waco 2009, no pet.).

---

[3]    *See supra* note 2.

11

However, a presumption of finality exists with regard to judgments following a conventional trial on the merits. *Vaughn v. Drennon*, 324 S.W.3d 560, 562–63 (Tex. 2010) (discussing *Ne. Indep. Sch. Dist. v. Aldridge*, 400 S.W.2d 893, 897–98 (Tex. 1966)); *In re M.A.B.*, No. 01-15-00388-CV, 2015 WL 6081937, at *4 (Tex. App.—Houston [1st Dist.] Oct. 15, 2015, no pet.) (mem. op.). If there is doubt about the finality of a post-trial order, we consider the language of the decree and the record as a whole, "aided on occasion by the conduct of the parties." *Vaughn*, 324 S.W.3d at 563 (quoting *Lehmann*, 39 S.W.3d at 203); *see M.O. Dental Lab v. Rape*, 139 S.W.3d 671, 675 (Tex. 2004) (noting that summary judgment against single defendant can be final judgment if co-defendant was never served and never appeared and "all parties appear to have treated [the order] as final").

The order granting Mother's motion for a directed verdict and declining to terminate her parental rights does not address Father's parental rights. It also does not contain language that would indicate an intention by the trial court to enter a final order. For example, it does not state that it is a final order. It sets a new dismissal date in the future. And it does not include the statutorily required language of a final order on termination. *See* TEX. FAM. CODE ANN. § 263.405(b). Thus, the trial court did not demonstrate an intention to enter a final judgment.

To the extent any party evidenced an understanding that the directed verdict was a final order, it also pleaded an opposite understanding. For example, the

Department moved for a new trial and filed a direct appeal but later dismissed the appeal with a statement that it was not a final judgment. Further, Mother continued accepting services under the monitored-return order and did not object to the continuing jurisdiction of the trial court beyond the date the directed verdict was granted. Father took no actions at all.

After considering the language of the directed verdict, the record as a whole, and the conduct of the parties, we conclude that the directed verdict was an interlocutory order that failed to dispose of all parties and issues. The final order in this suit was not issued until September 10 when the trial court dismissed all parties and claims. *See Lehmann*, 39 S.W.3d at 195.

There is no provision for interlocutory appeal of an order denying a termination petition; we do not have jurisdiction over such interlocutory orders. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014 (West Supp. 2015) (stating those interlocutory orders that are appealable). Once a final order issues in a termination suit, either party may appeal the order. TEX. FAM. CODE ANN. § 109.002(b) (West 2014). The appeal is accelerated. *Id.* § 109.002(a). Because the appeal is accelerated, the notice of appeal is due 20 days after the judgment is signed. *Id.* § 109.002; TEX. R. APP. P. 26.1(b); *see C. Chambers Enters., Inc. v. 6250 Westpark, LP*, 97 S.W.3d 333, 334 n.1 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

The Department filed a notice of appeal within 20 days of the dismissal order. Therefore, the notice of appeal was timely, and we have jurisdiction to determine this appeal. We turn, then, to the Department's contention that the trial court erred.

**Directed Verdict**

In a case to terminate parental rights under Section 161.001, the Department must prove, by clear and convincing evidence, (1) that the parent committed one or more of the enumerated acts or omissions justifying termination and (2) that termination is in the child's best interest. TEX. FAM. CODE ANN. § 161.001; *In re J.O.A.*, 283 S.W.3d 336, 344–45 (Tex. 2009). "Only one predicate finding . . . is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). At trial, the Department relied on five grounds for terminating Mother's parental rights. On appeal, it abandons the mental-health ground and argues that it presented legally sufficient evidence to avoid a directed verdict under subsections (D), (E), (O), and (P) and on the best-interest-of-the-child issue.

We will affirm the trial court's order unless the Department establishes that there is legally sufficient evidence of at least one of the four predicate grounds *and* that termination is in the children's best interest.

## A.    Standard of review

A parent's rights to the "companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). A termination decree is final, irrevocable, and permanently divests the parent of all legal rights, privileges, duties, and powers with respect to the parent-child relationship except for the child's right to inherit. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Id.* However, "the rights of natural parents are not absolute" and "the rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." *In re A.V.*, 113 S.W.3d at 361. Recognizing that a parent may forfeit his or her parental rights by their acts or omissions, the primary focus of a termination suit is protection of the child's best interests. *Id.*

The burden of proof in termination cases is "clear and convincing evidence." *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002) (citing *Santosky*, 455 U.S. at 769, 102 S. Ct. at 1403); TEX. FAM. CODE ANN. § 161.001(b). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007. This is an intermediate

standard that falls between "preponderance of the evidence" used in ordinary civil proceedings and "reasonable doubt" used in criminal proceedings. *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979).

When proof is by clear and convincing evidence, our review must take into consideration whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the matter on which the State bears the burden of proof. *In re J.F.C.*, 96 S.W.3d at 266; *In re J.R.*, 319 S.W.3d 773, 775 (Tex. App.—El Paso 2010, no pet.). We disregard all evidence that a reasonable factfinder could have disbelieved or found to be incredible, but we are not required to disregard all evidence that does not support the judgment. *In re J.F.C.*, 96 S.W.3d at 266. If we determine that "no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then . . . the evidence is legally insufficient." *Id.*

**B.    Parental acts or omissions justifying termination**

The Department asserts that termination is warranted under four subsections. We begin by considering whether the Department presented legally sufficient evidence to avoid a directed verdict under Subsection (O).

An individual's parental rights may be terminated under Subsection (O) if (1) the Department has been the child's temporary managing conservator for at least nine months, (2) the Department took custody of the child as a result of an

16

emergency removal for child abuse or neglect, (3) a court issued an order establishing the actions necessary for the parent to obtain the return of the child, and (4) the parent did not comply with the court order. TEX. FAM. CODE ANN. § 161.001(b)(1)(O); *In re S.M.R.*, 434 S.W.3d 576, 584 (Tex. 2014).

The trial court ordered Mother to comply with her Department Family Service Plan, which specified the following tasks:

- Maintain monthly contact with caseworker

- Submit to and pass random drug testing

- Attend, participate, and complete an intensive *outpatient* treatment program

- Attend and participate in NA/AA meetings at least three times per week

- Attend and participate in individual counseling to address issues including domestic violence, history of Department involvement, life choices, and parenting

- Attend and participate in family counseling

- Obtain and maintain gainful employment to provide basic necessities for the child

- Maintain safe and stable housing that is sanitary, drug-free, free of safety hazards, and has working utilities

- Attend and participate in supervised visitations with the children once per month for two hours

17

The Department asserts that Mother did not successfully complete the outpatient therapy for substance abuse and did not pass all drug tests. It does not argue that she failed to complete any of the other tasks listed in the service plan.

Mother responds by highlighting all of the requirements she did successfully complete and stating that she "participated regularly in counseling while maintaining a full-time job at a reputable business in the community for approximately two years while this case was pending," even if she did not technically complete the outpatient therapy. Further, she voluntarily enrolled in and completed a 30-day *inpatient* therapy stay that the Department did not require.

The Department concedes that Mother completed inpatient therapy but argues that her failure to successfully complete the required outpatient program prevented the trial court from granting a directed verdict on this statutory grounds because "substantial compliance" is a fact question.

"Parents frequently fall short of strict compliance with a family-service plan's requirements." *In re S.M.R.*, 434 S.W.3d at 584. While addressing whether "imperfect compliance" with a family service plan should result in termination, the Texas Supreme Court has stated that "whether a parent has done enough under the family-service plan to defeat termination under subpart (O) is ordinarily a fact question." *Id.*; *see In re J.S.*, 291 S.W.3d 60, 67 (Tex. App.—Eastland 2009, no pet.) (noting that Family Code has no provisions regarding partial compliance or

18

excuses for noncompliance and applying factual sufficiency standard to parent's challenge to termination of her parental rights following partial compliance).

Mother testified that she began the required outpatient therapy in November 2013. While engaging in outpatient therapy, she asked if she could voluntarily submit to a more intensive *inpatient* therapy option.[4] She spent 30 days at the ADA House residential treatment center in Galveston. There she participated in individual counseling, attended NA/AA meetings, and took classes on relapse prevention, domestic violence prevention, and parenting. Mother testified that, as a result of this experience, she obtained a NA/AA sponsor, stopped socializing with old friends who used drugs, and established relationships with new friends who were maintaining their sobriety.

After completing inpatient therapy, Mother began outpatient therapy at Gulf Coast three times per week for four hours each visit. She was pregnant with the younger of the two girls, Cheryl, at the time. After completing approximately six weeks of outpatient therapy—with four weeks still remaining to comply with the Department's service-plan requirements—her "counselor told [her] to take maternity leave." She continued to attend NA/AA meetings three times per week and individual counseling sessions at the CPS office throughout the remainder of

---

[4]  Mother did not specify who she asked to switch from outpatient to inpatient therapy.

her pregnancy. She testified that she even attended an NA meeting on the day she was released from the hospital following Cheryl's cesarean delivery.

Mother returned to Gulf Coast to continue outpatient therapy a few weeks after Cheryl's birth. She began to struggle with maintaining her schedule, though, because her restaurant shifts did not end until late at night and her therapy sessions were early in the morning; therefore, she asked to adjust her schedule so that she could work during the afternoons and attend therapy sessions after work. It took two weeks for the change to be approved, which caused a delay in attendance. Shortly after she began her new schedule, she asked to switch back because she was making less income working afternoon shifts than she had been earning during the evening shifts. After the change back was approved, she developed pink eye. Her counselor told her to stop attending until it healed. Mother then missed additional sessions due to a death in the family. All of this culminated in Gulf Coast discharging her for excessive absences.

Mother testified that she wanted to continue outpatient therapy but could not without a new "2054" authorization from her caseworker. She explained that she was unable to get the authorization she needed because her caseworker stopped "speaking to" her for several weeks. Even though she was not attending outpatient therapy, she did continue attending NA/AA meetings several times per week. At

the time of trial, she still had not completed her service plan's outpatient-therapy requirement.

In addition to the evidence that Mother failed to complete the outpatient therapy required under her service plan, there was undisputed evidence that she tested positive for cocaine twice during the first year of her service plan and took Vicodin without a prescription during the second year.

The Family Code does not contain any provisions for excusing incomplete service-plan compliance. *See In re J.S.*, 291 S.W.3d at 67. When a parent has shown "substantial compliance," it is generally treated as a fact question whether there was adequate compliance to prevent termination under Subsection (O). *See In re S.M.R.*, 434 S.W.3d at 584. Consistent with that approach, the Department argues that Mother's incomplete compliance raised a fact issue and prevented the trial court from entering a directed verdict on the Department's Subsection (O) basis for termination.

The factfinder's role is to resolve disputed issues. *See In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). Had the issue been submitted to the jury, it would have weighed the evidence of noncompliance with two provisions of the service plan against the evidence of compliance with all seven of the other service-plan requirements, as well as Mother's enrollment in and completion of voluntary *inpatient* therapy. Because the trial court's ruling prevented the jury from weighing

this evidence to determine whether Mother's partial noncompliance warranted termination of her parental rights under Subsection (O), we conclude that the trial court's ruling on this issue was erroneous. The evidence of two failed drug tests, likewise, should have prevented a directed verdict under Subsection (P) which permits termination for use of controlled substances.

Having concluded that the trial court erred by granting a directed verdict on at least one of the bases for termination, the trial court's order is subject to reversal if the trial court also erred by granting a directed verdict on the best-interest factor. Accordingly, we will consider next the best-interest factor instead of addressing each remaining basis for termination.

## C.    Best interest of the children

In addition to a predicate violation, the Department must establish by clear and convincing evidence that termination is in the children's best interest. TEX. FAM. CODE ANN. § 161.001. There is a strong presumption that the child's best interest will be served by preserving the parent-child relationship. *In re J.F.C.*, 96 S.W.3d at 294; *see* TEX. FAM. CODE ANN. § 153.131(b).

Because of the strong presumption that maintaining the parent-child relationship is in the child's best interest and the due-process implications of terminating a parent's rights without clear and convincing evidence that termination is in the children's best interest, "the best interest standard does not

22

permit termination merely because a child might be better off living elsewhere. Termination should not be used to merely reallocate children to better and more prosperous parents." *In re W.C.*, 98 S.W.3d 753, 758 (Tex. App.—Fort Worth 2003, no pet.); *see In re E.N.C.*, 384 S.W.3d 796, 809 (Tex. 2012).

The factfinder may consider a number of factors to determine the child's best interest, including the child's desires, the child's present and future physical and emotional needs, the present and future emotional and physical danger to the child, the parental abilities of the people seeking custody, programs available to assist those people in promoting the child's best interest, plans for the child by those people or by the agency seeking custody, the parent's acts or omissions that may indicate that the existing parent-child relationship is not appropriate, and any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

In some cases, undisputed evidence of only one factor may be sufficient to support a finding that termination is in the best interest of the child; in other cases, there could be "more complex facts in which paltry evidence relevant to each consideration mentioned in *Holley* would not suffice" to support termination. *In re C.H.*, 89 S.W.3d at 27. Our "best interest" analysis is not limited to these *Holley* factors; other factors may be considered. *Holley*, 544 S.W.2d at 371; *In re C.H.*, 89 S.W.3d at 27.

The termination trial focused on Mother's failure to complete outpatient therapy, any excuses that might exist for that failure, and whether Mother either already had relapsed or might in the future. There was evidence that Mother tested positive for cocaine and marijuana when Cindy was first removed from the home in January 2013. Later, in May 2013, while receiving services, she tested positive for cocaine. In July, she tested positive for cocaine again. She had negative drug test results for more than a year after that. Then, in December 2014, she did not submit to a required drug test and, instead, revealed that she had taken Vicodin without a valid prescription. She testified that she took a single dose to treat back pain. While there was no contrary evidence, a jury conceivably might not have found her explanation credible. *See Rosenblatt v. Freedom Life Ins. Co. of Am.*, 240 S.W.3d 315, 319 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (stating general rule that factfinder may believe all, part, or none of witness's testimony but cannot ignore undisputed testimony "that is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted." (quoting *City of Keller v. Wilson*, 168 S.W.3d 802, 820 (Tex. 2005))). She did not fail another drug test after the Vicodin incident.

A Department caseworker testified that the permanency goal changed from family reunification to parental termination in September 2014 due to Mother's noncompliance with her service plan, specifically the uncompleted outpatient

24

therapy. The caseworker testified that she agreed with the change. When asked to explain the basis for her recommendation, she noted the "admission to using Vicodin" once in December 2014 and the "unsuccessful discharge" from the outpatient program at Gulf Coast treatment center. The caseworker was concerned that the children would "have to worry about coming into CPS care because of relapses" if they were returned to Mother.

Mother's aunt also testified. When Cindy was removed from Mother's care, her aunt agreed to a placement in her home. The aunt cared for Cindy for eleven months but returned her to the Department's care when the aunt developed health issues. The aunt testified that she and Mother had a "strained relationship" for "over a decade" because of Mother's past "drug abuse, instability, and ongoing investigations with CPS."[5] She stated that she did not approve of Mother's current behavior because she believed Mother was living with a man and should be focused on "trying to get the children back," not on "a relationship with a man."

The aunt testified that she observed some of Mother's visits with her girls. She described the children as "happy" during the visits and agreed that the visits were not "unhealthy" for the children. Yet she also testified that she was invited to the foster mother's home, observed her interactions with the girls, and felt that "in

---

[5]     Mother was the subject of earlier CPS investigations concerning three children she had before Cindy and Cheryl. She voluntarily relinquished custody of two of the children in 2005 and the third in 2007.

comparison" there was "improved disposition in [the girls'] happiness and . . . being content and happy" with the foster mother. *Cf. In re W.C.*, 98 S.W.3d at 766 ("Although [parental] behavior may reasonably suggest that a child would be better off with a new family, the best interest standard does not permit termination merely because a child might be better off living elsewhere.").

The aunt was asked whether she would support termination of Mother's parental rights even if she successfully completed *all* that the Department asked of her. She responded: "As much as it hurts, it's not an easy thing for me to say . . . just the history—and I'm talking a decade—I would be in favor of the children being adopted."

Another witness who testified that she supported termination was the CASA representative who took over the case after the Department changed its goal from reunification to termination. She testified that it was her job to evaluate the children's best interests. She observed only one visit between Mother and the girls. The visit went well; everyone was excited to see each other. Salinas acknowledged that Mother made progress under her service plan. Nonetheless, she opined that termination would be in the children's best interest, giving the following explanation:

> There's the uncertainty of the—the use that she's had and just her trustfulness and in the long term, looking at the girls' future, what that might look like worries me.

26

She noted that the children had been calling their foster mother "mom" and referred to Mother by her first name. She also admitted to telling Mother during a home visit that "maybe you'll get married down the line and maybe you'll have more children."

There was no evidence that Mother's relationship with her two daughters was lacking. She was described as a loving mother who interacted appropriately and was motivated to have her children returned to her care. Her visits with her children went "well" and her interactions were described as "appropriate." Mother paid attention to the children, appropriately redirected them when necessary, brought them food and toys, and played with them. She also made great strides to improve her living situation by securing stable housing and steady employment to provide for her children. Her therapist's correspondence with the Department, in which she confirmed her recommendation of family reunification in November 2014, included the following statements:

> Mother has impressed me. . . . She has demonstrated a strength that I honestly doubted she had . . . [and has] won my support. I support reunification when she can find stable housing but I believe she also needs a parent mentor and positive peer support for her to maintain this strength and independence overtime. She has potential. . . . She is focused and determined to deal with her past failures . . . and caring for her kids. Engagement heavily in [NA] meetings, a sponsor, church family, etc. could be transforming for this young mother. . . .

In response to the caseworker's statement that she had "concerns" about the reunification goal, the therapist wrote:

I have had more sessions with [Mother] than any client in my CPS contracted history. . . . She was a stellar client . . . [and was] determined and motivated. Becky (supervisor) and the previous caseworker were in support of reunification as the sole goal. I guess I don't understand what has changed . . . that justifies the change in goal."

The Department did not present evidence on every *Holley* factor. It failed to offer clear and convincing evidence that termination was in the children's best interest with regard to the factors that consider the children's desires, the children's current emotional and physical needs, parental abilities, programs available, or stability of the home. *See Holley*, 544 S.W.2d at 371–72.

Nonetheless, we conclude that the Department presented sufficient evidence to meet the threshold necessary to avoid a directed verdict with regard to the factors that consider the parent's acts or omissions and future emotional danger to the children. It was uncontroverted that Mother had a long history of drug use. Her counselor testified that opiate dependency has a high rate of recidivism. The Department assigned Mother specific tasks that she would need to complete to improve her changes of long-term sobriety and to be eligible for the return of her children, including successful drug testing and completed outpatient therapy. Mother failed two drug tests, illegally used Vicodin without a prescription, and failed to complete the required outpatient therapy.

A factfinder reasonably could have concluded that this evidence was sufficient to produce a firm belief or conviction that Mother was unlikely to

maintain her sobriety, that the great strides she had made over the course of the Department intervention might unravel, and that the best interest of the children would be to sever the parent-child relationship. Likewise, we acknowledge that a factfinder reasonably could have concluded the opposite: that the evidence was not sufficient to produce a firm belief or conviction that termination was in the children's best interest because the children had a strong bond with their mother, her parenting skills were not criticized by any witness, and she showed a strong determination to end her drug use as well as evidence of some success at her endeavor.

Because a factfinder could have reasonably reached either resolution of the issue, we conclude that the trial court erred by granting a directed verdict on the best-interest factor. Having concluded that the trial court erred by granting a directed verdict on termination under Subsection (O) and the best-interest factor, we reverse the court's March 2015 order.

## Conclusion

We reverse the trial court's order granting a directed verdict and remand the case for further proceedings, including an evaluation of temporary conservatorship and placement.

Harvey Brown
Justice

Panel consists of Justices Bland, Brown, and Lloyd.

29